AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. ___'23 MJ01770___ |
| Meta Platforms, Inc. Instagram Account kshogun.my | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591; | Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking of Children; |
| 18 U.S.C. § 2421; | Transportation for Purposes of Prostitution; |
| 18 U.S.C. § 922g(1) | Felon in Possession of Firearm |

The application is based on these facts:

See Attached Affidavit of Special Agent Aron Marcellus with Homeland Security Investigations (HSI), incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aron Marcellus, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: ___05/18/2023___

_____
*Judge's signature*

City and state: ___San Diego, California___

Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

**<u>AFFIDAVIT</u>**

I, Aron Marcellus, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) and Crim. Rule of Proc. 41 for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California.   As described further in Attachment A, this request is made to search the following Instagram user Account (referred to herein as the "**Target Account**") for items that constitute evidence, fruits, and instrumentalities of violations of federal law, namely, 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking of Children); 18 U.S.C. § 2421 (Transportation for Purposes of Prostitution); and 18 U.S.C. § 922g(1) (Felon in Possession of Firearm), as more fully described in Attachment B, for the time period from March 1, 2020 up to and including December 1, 2020 for the **Target Account**:

> a.     kshogun.my, believed to be used by Kenneth TENORIO (the "**Target Account**")

2.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking of Children); 18 U.S.C. § 2421 (Transportation for Purposes of Prostitution); and 18 U.S.C. § 922g(1) (Felon in Possession of Firearm) have been committed by Kenneth TENORIO ("TENORIO").   There is also probable cause to believe that a search of the **Target Account** as described in Attachment A will produce evidence, fruits

1

and/or instrumentalities of the aforementioned crime, as described in Attachment B.

3.     The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Account**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

4.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

5.     I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.

These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes, and bulk cash smuggling.

6.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

7.     Since October 2019, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

8.     I have become familiar with Instagram and other social media sites through my investigations.  I have examined many Instagram accounts and I have learned that suspects often use social media sites for communications in an effort to bypass law enforcements attempts to uncover their criminal activity. Based on my training, experience, and communications with other law enforcement officers, I have learned specific techniques in being able to identify suspects and associates even when they use fictitious names or aliases within social media sites. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.     Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.      Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

c.      Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

d.      Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

e.      Individuals involved in illicit commercial sex use social media sites like Instagram to find clients and prostitutes.  They use Instagram messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities.  They will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients.  These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, as well as contact information for co-conspirators and clients.  Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution.

9.      Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "e" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts such as Snapchat, Instagram, and Facebook as well as email accounts, which can be accessed on computers and cellular telephones.

## FACTS IN SUPPORT OF PROBABLE CAUSE

10.     On February 9, 2022, HSI Special Agents (SA) assigned to the HTTF received a lead regarding a human trafficking case originating out of the Chula Vista Police Department ("CVPD").   HSI then began investigating Kenneth TENORIO in connection with sex trafficking in multiple different jurisdictions – including San Diego, Dallas, Oakland, El Paso, and Phoenix – involving multiple victims, including two adult victims and juvenile victim.

11.     The investigation stemmed from TENORIO's trafficking of AF1 in October and November 2020.   She was 19 at the time.   At the end of November 2020, she called the police and reported that she had been raped, beaten, and forced by TENORIO to work as a prostitute.   In particular, she reported that TENORIO had picked her up from her residence in his vehicle, pressed a handgun against her stomach, and told her she was going to work for him now.   She told law enforcement that TENORIO had picked her up again shortly afterward, and she was then forced to work for him in various cities for the next two months until finally escaping at the end of that year.   AF1 told investigators that TENORIO had taken her from California to Dallas, Texas, in November 2020, to work as a prostitute, that he had posted commercial sex advertisements of her while there, and that she had a number of commercial sex dates while in Dallas.   According to AF1, following an incident in which TENORIO sexually assaulted her in their hotel room in Dallas, she called the police.   AF1 was able to return to San Diego, and TENORIO was later arrested.

12.     During October and November 2020, TENORIO trafficked AF1 in both Oakland and San Diego utilizing online commercial sex websites like

Megapersonals[1], conducting street-based prostitution on the "blade"[2] and use hotels for incalls[3].   During this period of time, TENORIO also trafficked his daughter, AF2, and began trafficking a minor female, JF1, who was 15-years-old at the time.   TENORIO took JF1 to work the blade knowing that she was a minor and took a portion of the proceeds that she earned.   I have reviewed commercial sex advertisements posted of AF1 and AF2 on Megapersonals and other commercial sex websites, which appear to have been posted in Dallas, San Diego, Los Angeles County and San Bernardino County, Phoenix, El Paso, and Dallas.

13.   Throughout the investigation, the victims reported experiencing both extreme physical violence and sexual assault as well as threats of force if they did not work.   AF1 reported witnessing TENORIO in possession of various assault rifles and handguns, which, as further described below, was corroborated by the publicly available information associated with the **Target Account**.   Among other uses of force, AF1 reported that on one occasion TENORIO showed her two custom assault rifles and said, "This is what you're going to get if you're not going to work."   On another occasion, AF1 reported that TENORIO pushed her to the ground and put his foot on her neck, then picked up an assault rifle and used the butt of the weapon to strike her foot while stating, "This is how you break in a new AR, on a bitch."   AF1 also recalled TENORIO's reckless ease with guns, reporting that he would shoot his gun out the window "just to have fun."   Corroborating the threats and use of force, when interviewed, AF2 stated that TENORIO forced her

---

[1] Based on my training and experience, I know this to be a dating website that is frequently used to solicit prostitution.

[2] Based on my training and experience, I know that the "blade" is a slang term that refers to an area of town where prostitutes/sex workers solicit sex-buyers.

[3] Based on my training and experience, I know that an incall is where a sex-buyer agrees to travel to where the sex-worker is located.

into commercial sex work beginning in March 2020 through October 2020, and that on a few occasions she refused to go on commercial sex "dates" in San Diego and Defendant would have other male associates beat her until she complied.

14.    AF1 provided law enforcement with TENORIO's Instagram account, the **Target Account**, which at the time was open to the public for viewing.  On the public page for the **Target Account**, I was informed by Detective Eddie Chavira of the CVPD that he the observed multiple photos and videos of TENORIO to include the following:

a. On July 18, 2020, a photo of a high school diploma, with the recipient's name "Aaliyah D. TENORIO."  The caption of the photo read, "My daughter's diploma!  And she got her own apartment."

b. On October 31, 2020, a photo of an unknown woman holding a stack of cash in both hands, pressing against her face, pushing her lips out, was posted with the caption, "She doin' her thaang thang!"

c. On August 28, 2020, a photo of what appeared to be TENORIO, his daughter, Aaliyah, his son, Patrick, and his grandson all posed for a photo in front of a beach with the caption, "The TENORIOs!"

d. On November 24, 2020, a photo of a slice of having pizza was posted with the caption "Great Dallas Pizza."

e. On December 10, 2020, a video of what appeared to be TENORIO's son, Patrick, shooting a black assault rifle with a collapsible butt stock, pistol grip, a magnifying scope, red dot sight and an extended magazine, in an open field with the caption, "My Son Shooting Stingray!!!!!  She sin No Joke!!!!"

f. On December 10, 2020, a video of what appeared to be Patrick, TENORIO's son, kneeling in front of a wooden box holding a

black assault rifle, with a collapsible butt stock, pistol grip on a tripod, aiming at a target with the caption, "Son shooting long shank w/o the scope."

g.  On December 26, 2020, a video of what appears to be Patrick, TENORIO's son assisting TENORIO's grandson with holding and shooting a black assault rifle, collapsible butt stock, a pistol grip and scope with the caption "Getting grandson ready !!"

14.    All of the above-described photos and videos corroborate AF1's statements that TENORIO was in possession of and had access to weapons during the time period that she reported, as well as reflecting his relationship with daughter, AF2.   One of the photos described above also corroborates TENORIO's trip to Dallas with AF1.   AF1 stated TENORIO always kept the weapons with him, either in his home or in whatever vehicle he was driving.   A records check of TENORIO reflected felony convictions of Penal Code § 211 and Penal Code § 140, among other convictions, which prohibit TENORIO's possession of firearms or ammunition.

15.    On March 10, 2021, California Search Warrant number 2103100857-CVPD-SBM-SW was issued by the Honorable Sharon Majors-Lewis of San Diego Superior court Judge, authorizing a search of the **Target Account**.   None of the information obtained from the execution of this warrant is relied upon herein for purposes of establishing probable cause.

16.    On January 17, 2023, Kenneth Tenorio ("Defendant") was arraigned on a five-count Indictment charging Defendant with one count of Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591; three counts of Transportation for Purposes of Prostitution, in violation of 18 U.S.C. § 2421; and one count of Sex Trafficking of Children, in violation of 18 U.S.C. § 1591, pertaining to allegations regarding Defendant's actions in trafficking a fifteen-year old.   (ECF No. 5.)   The case is currently pending in Case No. 22-cr-2746-CAB.

## BACKGROUND INFORMATION ON INSTAGRAM[4]

17.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the **Target Account** listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

18.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

19.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses[5] used to create and use an account, unique identifiers and other

---

[4] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

[5] An IP address is expressed as groups of numbers separated by decimal points and is unique to a particular device during an online session.  The IP address can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different number to a device every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's device a particular IP address, which is used each time the device accesses the Internet.

information about devices and web browsers used to access an account, and session times and durations.

20.    Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

21.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

22.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

23.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data

unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

24. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

25. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

26. Users can interact with posts by liking them, adding, or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

27. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

28.     Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

29.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders cannot view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

30.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

31.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

32.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

33.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

34.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

35.    For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

36.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Meta (hereinafter "the internet service provider" or "the ISP") are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP.  The impact on the ISP's business would be severe.

37.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the **Target Account**, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. The copies will be provided to me or to any authorized federal agent.  The copies will be imaged, and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

38.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP does not always organize the electronic files they provide chronologically, which makes review even more time

consuming and may also require the examiner to review each page or record for responsive material.

39.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis and within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

40.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

41.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation, and extraction of data within the scope of this warrant.

## GENUINE RISK OF DESTRUCTION OF EVIDENCE

42.     Based upon my experience and training, and the experience and training of other detectives with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.  In addition, a preservation request was sent to Facebook ordering the preservation of data associated with the **Target Account**.  The **Target Account** was initially preserved in February 2021 and again in May 2023.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

43.     Outside of what is outlined above, the United States has not attempted to obtain this data by other means.

## CONCLUSION

44.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion and Sex Trafficking of Children); 18 U.S.C. § 2421 (Transportation for Purposes of Prostitution); and 18 U.S.C. § 922g(1) (Felon in Possession of Firearm), as described in Attachment B, are likely to be found in the property to be searched, as described in Attachment A.

Aron Marcellus
Special Agent
Homeland Security Investigations

Subscribed and sworn before me this 18th day of May 2023.

Honorable Allison H. Goddard
United States Magistrate Judge

16

# **ATTACHMENT A**
# **ITEMS TO BE SEARCHED**

This warrant applies to information associated with the following Instagram User account:

    a.  kshogun.my (the "**Target Account**")

The **Target Account** is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B
### *Particular Things to be Seized*

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) in February 2021 and May 2023 (the "**Target Account**"), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.     Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers from March 1, 2020 up to and including December 1, 2020;

7.     Privacy and account settings, including change history; and

8.     Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.     All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from March 1, 2020 up to and including December 1, 2020;

C.     All content, records, and other information relating to communications sent from or received by the account from March 1, 2020 up to and including December 1, 2020:

1.     The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.     All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.     All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.     All associated logs and metadata;

    D.      All content, records, and other information relating to all other interactions between the account and other Instagram users from March 1, 2020 up to and including December 1, 2020, including but not limited to:

        1.     Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

        2.     All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

        3.     All contacts and related sync information; and

        4.     All associated logs and metadata;

    E.      All records of searches performed by the account from March 1, 2020 up to and including December 1, 2020; and

    F.      All location information, including location history, login activity, information geotags, and related metadata from March 1, 2020 up to and including December 1, 2020.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Search and Seizure of Information by the Government

The search of the data supplied by the ISP pursuant to this warrant will be conducted by HSI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited from March 1, 2020 up to and including December 1, 2020. Agents will seize information described above in Section II that constitutes fruits, evidence, or instrumentalities of violations of Sex Trafficking by Force, Fraud, or Coercion (18 U.S.C. § 1591); Transportation for Purposes of Prostitution, (18 U.S.C. § 2421); Sex

Trafficking of Children (18 U.S.C. § 1591), and Felon in Possession of Firearm (18 U.S.C. § 922g(1), for the user ID identified on Attachment A, information pertaining to the following matters:

a.      tending to discuss or establish efforts to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person by force, fraud, or coercion to engage in a commercial sex act or tending to discuss or establish the sexual exploitation of children; tending to discuss or establish efforts to transport a person in interstate or foreign commerce with intent that such person engage in prostitution; or tending to discuss or establish the unlawful possession of a firearm;

b.      tending to identify criminal associates, co-conspirators, or others involved in the offenses described in the affidavit;

c.      tending to identify the user of, or persons with control over or access to the **Target Account**, including records that help reveal the whereabouts of such person(s).